IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 7, 2002 Session

## TIMOTHY ROBERSON v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Gibson County**
**No. 14863     L.T. Lafferty, Judge**

_____

**No. W2001-00549-CCA-R3-PC - Filed July 12, 2002**

_____

The petitioner, Timothy Roberson, was convicted in 1995 of first degree murder and especially aggravated robbery, receiving respective sentences, to be served consecutively, of life without parole and fifteen years as a Range I, standard offender. Following an unsuccessful direct appeal of his conviction, he filed a petition for post-conviction relief, alleging ineffective assistance of counsel at trial. The post-conviction court dismissed the petition following a hearing, and the petitioner timely appealed. We affirm the order denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Shannon A. Jones, Alamo, Tennessee, for the appellant, Timothy Roberson.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Garry G. Brown, District Attorney General; and William D. Bowen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In his *pro se* petition for post-conviction relief, the petitioner presented the following claims:

> I.     Petitioner's convictions and sentences are void, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 8 and 9, and Article XI, Section 16, of the Tennessee Constitution, in that his convictions and sentences were the result of the use of an alleged confession that was obtained from the Petitioner through the use of coercion and, after Petitioner had made it known that he desired the presence and assistance of counsel and that the

interrogation of him should cease until such time as counsel could be consulted.

II.     Petitioner's convictions and sentences are void, in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 8 and 9, and Article XI, Section 16, of the Tennessee Constitution, in that they are the result of the Petitioner having had ineffective assistance of counsel for his defense.

Following the post-conviction court's denial of the petition, the petitioner timely appealed, presenting the same issues, although phrasing them somewhat differently, that his statement was taken in violation of his right to due process and against self-discrimination, and, secondly, that his trial counsel were ineffective for failing to "interview State's witnesses," failing "to find and call witnesses vital" to the defense, and failing "to pursue the motion to suppress [his] confession."

We conclude, as did the post-conviction court, that the petitioner is not entitled to relief, and, accordingly, affirm the order denying the petition.

## BACKGROUND

The opinion of this court on the direct appeal of the petitioner's convictions sets out the facts of his offenses:[1]

> Clyde Smith, the father of the victim, Robert Smith, testified that he saw his son at approximately 9:30 p.m. on November 26, 1993. He said that on November 28, his mother called and told him that she had not seen the victim over the Thanksgiving weekend and that he always came by on Saturday. Mr. Smith stated that he and his other son, Charles Smith, went to the victim's apartment. He testified that he discovered the door to the apartment open and the lights out. According to Mr. Smith, Charles entered the apartment and called the victim's name, and when the victim did not respond, they left the apartment, believing that the victim had stepped outside. He said that they returned at about 6:30 p.m. and discovered the victim dead, lying on his back in a pool of blood in the kitchen. He testified that the apartment had been ransacked. Mr. Smith stated that he later found several items missing from the victim's apartment, including a VCR. He also said that he told Sergeant Morris that the victim generally carried a large sum of cash with him. According to Mr. Smith, the

[1]We are setting out the facts in detail because of the nature of the evidence and the petitioner's claims on appeal.

victim had some learning disabilities, although he was not classified as being mentally retarded and was able to function in society.

Dr. Jerry Francisco, a pathologist, testified that he along with Dr. Violet Hnilica conducted an autopsy of the victim. He stated that the examination of the victim showed that the cause of death was multiple injuries to the body. He said that the victim suffered blunt-force injuries to the head, cuts to the neck and a group of stab wounds to the chest. In Dr. Francisco's opinion, any of the types of injuries could have caused the victim's death. He testified that the injuries caused damage to the brain, the voice box, the lungs and the heart. He stated that there were thirteen stab wounds to the chest that were deep, penetrating the victim's heart, lungs and ribs. He said that two of the cuts to the victim's neck severed the jugular vein. Dr. Francisco described the victim's blunt-force injuries to the head as a broken skull extending to the base of the skull. On cross-examination, Dr. Francisco testified that it was possible that death or unconsciousness could have occurred after the first few injuries were inflicted. He also conceded that if the victim was unconscious after the first few injuries were inflicted, he would not have felt any pain. Dr. Francisco admitted that there was no way for him to determine how quickly the victim died, but he said that it would have taken at least minutes.

Sergeant Jerry Morris of the Milan Police Department testified that he responded to a call regarding the victim. He said that he discovered the victim lying on his back and partially on his right side in the kitchen surrounded by blood on the floor, wall and refrigerator. He stated that the victim was wearing a T-shirt and jeans and did not have shoes or socks on. Sergeant Morris testified that he found a towel with blood on it hanging on a towel rack in the bathroom. He also said that the bedroom had been ransacked in that clothes had been taken out of drawers and thrown at the foot of the bed. Sergeant Morris stated that the television in the living room was on but that the cable had been disconnected.

Sergeant Morris testified that the defendant was interviewed by the Milan Police Department on three occasions: (1) during the initial investigation, (2) on November 29, 1993, after Sergeant Morris talked to the defendant's girlfriend, Clara Langley, and an informant, and (3) on December 5, 1993. He said that he obtained a ring from Ms. Langley and that the informant told him about seeing the defendant with the VCR and the movies. Sergeant Morris said that during the

second and third interviews of the defendant, the defendant gave a statement. He testified that the defendant also gave a statement to the Tennessee Bureau of Investigation on November 30, 1993. Sergeant Morris stated that after the defendant's second interview, he recovered the victim's ring, approximately nine movies, VCR and a remote control, with the movies and the VCR being found at the defendant's home. He said that he verified that the VCR belonged to the victim. He testified that he also recovered the victim's wallet and diamond ring. Sergeant Morris stated that the defendant took him to where the defendant disposed of the wallet in a bush approximately fifty feet from Salinger Road. He testified that he recovered the victim's paycheck from a Texaco Station in Milan. He also identified the defendant's hiking boots and stated that the defendant told him that he was wearing the boots during the time of the victim's death.

The defendant's statement given to the Milan Police Department on November 29, 1993, reflects that the defendant claimed that he was at his brother's house and then went to the house of Nikki Wright between the hours of 9:00 p.m. and 2:00 a.m. on November 26, 1993. It also shows that the defendant told Sergeant Morris that he purchased a ring and VCR from a guy who was driving a 1991 or 1992 Grand Prix about 10:30 or 11:00 p.m. It states that the defendant told the officers that he paid fifty dollars for the ring and that he traded an air pump for the VCR, although he did not know who owned the items. The statement reflects that the defendant asserted that he got the airpump from the mother of his girlfriend and that the movies belonged to other people. It also states that the defendant denied harming the victim and that the defendant claimed that he had not seen the victim. In the interview, the defendant explained that his prints could be in the apartment because he visited the victim's home approximately three to four months earlier.

The defendant's written statement given to the TBI on November 30, 1993, reflects that the defendant admitted killing the victim. The defendant told the officers that he was addicted to crack cocaine and that he had borrowed money from the victim, with whom the defendant worked, on previous occasions to purchase drugs. He told them that he and the victim were paid on the Wednesday before Thanksgiving and that he spent two hundred dollars on crack cocaine which he smoked on Friday. The defendant said that he went to the victim's apartment between 11:30 p.m. and midnight because he was out of money and wanted to get some more crack cocaine. The defendant said that the victim was watching television when he

-4-

arrived and that he was wearing a T-shirt and pants but no socks or shoes. He said that he asked the victim for twenty-five dollars, but the victim refused, saying that the defendant owed him twenty-five dollars from one week earlier. The defendant said that he became mad and that he and the victim argued, pushed and shoved each other near the dining table. He stated that the victim told him to leave and then slapped him on the right side of his face.

The statement also reflects that the defendant told the officers that he "lost it" when the victim slapped him and that he grabbed a brown kitchen knife and struck the victim in the middle of the chest. The defendant said that he could not stop and that after the knife broke, he began kicking the victim in the head, shoulders and side while the victim was lying in the kitchen floor. He said that he then picked up a silver knife and stabbed the victim again in the chest, although he could not recall how many times. The defendant told the officers that the victim was still alive and was trying to remove a box cutter from his left pocket to try to stop him when he took the box cutter from the victim and cut the victim's throat. The defendant stated that he was so mad that he could not stop and claimed that he did not mean to do it but that he lost his mind. According to the defendant's statement, the defendant went to the bathroom and wiped his hands on a towel at some point.

The defendant's statement to the TBI also shows that the defendant said that he looked throughout the apartment for money or anything to sell, including the defendant's bedroom dresser drawers. He also admitted taking the victim's wallet, keys, ring, VCR and movies from the victim's apartment. According to the defendant, the victim's wallet contained one hundred and fifty dollars in cash and a paycheck in the amount of one hundred and fifty-nine dollars. The defendant told the officers that he went to his cocaine dealer's apartment in Milan immediately after leaving the victim's apartment and purchased crack cocaine. According to the defendant, he took the VCR and movies to his apartment and threw the victim's wallet into a field. The statement reflects that the defendant conceded cashing the victim's paycheck at a Texaco the next morning and using the money to purchase more crack cocaine.

Sergeant Morris also testified that the defendant gave a statement on December 5, 1993. The statement reflects that the defendant denied killing the victim and that he claimed that he had blackout spells and when he awoke, he saw a "figure," although he

-5-

saw no one. On cross-examination, Sergeant Morris testified that the defendant was crying and appeared to be remorseful during the statement given to the police department on November 30, 1993. He also stated that his investigation did not reveal anything that would conflict with what the defendant told him had occurred on the night of the murder.

Mike Cleary, an employee of Texaco, testified that the defendant came into the store at approximately 5:30 a.m. and asked him to cash the victim's payroll check. He said that he cashed the check, although the defendant told him that he did not have any identification with him.

Bobby Morley, owner of the Jewel Box in Milan, identified a lady's diamond ring that he sized for the defendant. He testified that he had earlier sold the ring to the victim.

Clara Langley testified that she was living with the defendant at the time the offense occurred and that she worked with both the defendant and the victim. She identified the lady's diamond ring as the one the defendant gave to her at 4:00 a.m. on the Saturday morning after the victim's death when the defendant asked her to marry him. Ms. Langley said that she asked him where he got the ring and that the defendant told her that he got it at a jewelry store in Humboldt. She also identified the VCR, remote control and videotapes and stated that the defendant brought them into their house on either Saturday or Sunday. She said that when she asked the defendant where he got the VCR, the defendant told her that he had gotten the items from a man who had a flat tire and he claimed that he traded an air pump for the VCR. On cross-examination, Ms. Langley testified that she suspected that the defendant was spending a lot of money on drugs around the time of his arrest. She also stated that the defendant was real nervous on Saturday morning.

Dr. Lynn Cager, a clinical psychologist, testified that she examined the defendant on November 2, 9, and 16, 1994, to determine the defendant's competency to stand trial and his mental condition at the time of the offense. She said that her evaluation showed that the defendant was an alcoholic and was addicted to cocaine and marijuana. She stated that the defendant was intoxicated at the time of the offense. In Dr. Cager's opinion, the defendant's behavior was partly a result of his intoxication, and the defendant's intoxicated state compromised the defendant's ability to conform his

behavior to the requirements of the law. Dr. Cager testified that the defendant's initial denial of guilt was consistent with his determination that the defendant suffered from substance abuse. She stated that she found the defendant to be remorseful about his conduct.

Dr. Cager's psychological evaluation report shows that the defendant's father was an alcoholic and that his brother and sister have serious substance abuse problems. It reflects that his parent's divorced at an early age and that the defendant's stepfather was verbally abusive to the defendant. The report states that the defendant, a high school graduate, began drinking and smoking marijuana at age eighteen and began using cocaine in 1991. It shows that the defendant's substance abuse became critical in 1992 when he lost his car and his job. The report reflects that the defendant stopped using drugs and alcohol for a period of time but began abusing alcohol, marijuana and cocaine approximately three weeks before the offense occurred. The results of the report are that although the defendant has maintained a relatively stable work history, he engages in behaviors that would warrant a diagnosis of a conduct disorder or antisocial personality disorder. It states that the defendant functions in the low average range of intelligence. The report shows that Dr. Cager's findings were that the defendant was competent to stand trial and that although the defendant's ability to conform his behavior to the requirements of the law was compromised because of his substance abuse, the defendant's ability to appreciate the wrongfulness of his behavior was not significantly impaired. In Dr. Cager's opinion, the defendant was sane at the time of the offense.

Richard Clark, a friend of the defendant, testified that the defendant came by his house at approximately 1:30 a.m. on November 27, 1993. He said that the defendant was "high" from smoking crack cocaine, "kind of nervous," and "jittery." Mr. Clark stated that the defendant had some crack cocaine with him and that the defendant smoked while he was with him.

State v. Timothy Roberson, No. 02C01-9508-CC-00245, 1997 Tenn. Crim. App. LEXIS 1195, at **2-14 (Tenn. Crim. App. Dec. 1, 1997), perm. to appeal denied (Tenn. June 29, 1998).

## ANALYSIS

Following the hearing, the post-conviction court made lengthy and detailed written findings of fact and conclusions of law, determining that the petition was without merit. We now will review that order.

The findings of fact of the post-conviction court are conclusive on appeal, unless the evidence preponderates against the findings. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999) (citing State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). The appellate court cannot "reweigh or reevaluate" the evidence. Id.; see also Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). However, the appellate court's review of the application of the law to the facts is de novo, without a presumption of correctness. See Burns, 6 S.W.3d at 461; Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App. 1997). Additionally, issues as to whether counsel was ineffective and whether prejudice resulted are mixed questions of law and fact. Burns, 6 S.W.3d at 461 (citing Goad v. State, 938 S.W.2d 363 (Tenn. 1996)).

In order to measure the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

-8-

Id. at 688-89, 104 S. Ct. at 2065. Petitioner must, therefore, establish that "the advice given or the service rendered was not within the range of competence demanded of attorneys in criminal cases[.]" Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (holding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different"). In the context of a guilty plea, a petitioner must show that, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d) (1997).

## I. Voluntariness of Confession

During his testimony at the post-conviction hearing, the petitioner testified that officers threatened his life if he did not sign a confession. He said that, as he was being transported to the Gibson County Jail, a Milan police officer told him "if [he] didn't give a confession that they would get rid of [him] and make it look like it was suicide." He asked to make a telephone call shortly after he had arrived at the jail, but was not allowed to do so. He was later taken into a room and "broke down and started crying and they started asking [him] questions in regard to the murder." The officers "wrote [the statement] down in their own words instead of the words" the petitioner spoke. "[P]apers" were then put in front of him, which he was told to sign. He testified that "after [the officer] had threatened [his] life [he] would have done anything." As a related claim, the petitioner testified that, at the time he signed the confession, he "was still under the influence of drugs from that weekend, so, with that and with the threat it made [him] paranoid." He said that he told both of his trial attorneys of the coercion.

Initially, we note that some of this post-conviction testimony by the petitioner appears to be in direct conflict with his testimony at the sentencing hearing, as reported in the direct appeal of his conviction:

> The defendant expressed remorse for committing the offense and stated that he accepted full responsibility for what happened. On cross-examination, the defendant admitted that he initially lied about his involvement in the crimes, but he claimed that he was scared. The defendant asserted that he used drugs usually on the weekends and that his drug use did not interfere with his work performance.

Roberson, 1997 Tenn. Crim. App. LEXIS 1195, at **29-30.

The State called Milan Police Sergeant Jerry Morris, who responded to the petitioner's claims:

> Q. Were you present when agents from the Tennessee Bureau of Investigation interviewed [the petitioner]?
>
> A. Yes, sir. I was.
>
> Q. At any time while you were present did they continue to question him after he had invoked his right to counsel?
>
> A. No, sir.
>
> Q. Now, the statement that was ultimately made by [the petitioner], where did that statement come from? Who was the source of it?
>
> A. The statement?
>
> Q. The statement – the confession that [the petitioner] issued, where did that information come from?
>
> A. It came from him. The statement came from him.
>
> Q. So, is there any merit to his allegation that it was fabricated by law enforcement?
>
> A. No, sir. He gave it himself to Agent Hughes and signed each page.

Q.    You never threatened to bring charges against any of his family members?

A.    No, sir. I did not.

Q.    Was [the petitioner] [M]irandized before you talked to him?

A.    Yes, sir, every time.

Q.    How long have you been a law enforcement officer?

A.    19 years.

Q.    Is it your practice to have a defendant execute a rights waiver before he's talked to?

A.    Yes, sir.

Q.    Was that done in this case?

A.    Yes, sir.

Q.    Do you happen to have a copy of that rights waiver with you?

A.    Yes, sir. I have several of them.

      GENERAL BOWEN: May I approach the witness, Your Honor?

      THE COURT: Yes.

A.    Here's the one where he gave the statement. Here's the other one when I talked to him at the County Jail.

Q.    Were these rights waivers signed before or after the statements that were taken?

A.    These were signed before.

Q.    Was there ever a time when you took a statement and then went and stuck the rights waiver under his nose – [the petitioner's] nose?

A.    No.  Here's another one that was before questions that Officer McLean asked him.

Q.    Will you allow these to be admitted as an exhibit to your testimony?

A.    I will.  Yes, sir.

During cross-examination, the petitioner was asked if he had told the general sessions judge about the threats to his life by police officers:

Q.    Did you tell Judge Agee that Sergeant Morris had threatened your life?

A.    No.

Q.    Were you afraid that the Judge was in cahoots with the police, too?

A.    I basically was afraid that the State itself was in cahoots to convict me and get me off the streets 'cause I was living with a white girl.

Q.    So, you felt like all law enforcement agencies and any member of the bench – any Judge would have been in on that conspiracy?

A.    It's possible.

The post-conviction court found as follows regarding the petitioner's claims that his rights were violated in the taking of his confession:

As to the claim of an alleged coerced confession, the petitioner stated that Sgt. Morris of the Milan, Tennessee Police Department, during a ride from the Milan Police Department to the Gibson County jail, threatened to kill him and make it look like a suicide if he did not give a confession.  The petitioner stated that he did give a statement to Agent Hughes, of the TBI, after he was given his Miranda rights and signed a waiver, but the statement was given under coercion, threats and while under the influence of crack cocaine.  In contrast, Chief Earl Morris of the Gibson Police Department, testified that he investigated the death of Robert Smith.  However, he did not transport the petitioner to the Gibson County jail.  Officer Larry Williams was the transporting officer.  Chief Morris denied that he

-12-

threatened to kill the petitioner or coerced him into a confession. In fact, Chief Morris did not take any confession from the petitioner, but Agent Hughes of the TBI took a statement. Chief Morris identified the petitioner's waiver of rights form and his statement given to Agent Hughes. As to the petitioner's state of mind, it was Chief Morris's opinion that the petitioner was not under the influence of any drug or intoxicant at the time he gave his statement. Based on the demeanor of these two witnesses and the totality of all the circumstances, the Court finds that the petitioner was advised of his rights, per Miranda v. Arizona, and that his written statement was given freely, voluntarily and intelligently.

We conclude that the record fully supports the findings of the post-conviction court in this regard. This claim is without merit.

## II. Ineffective Assistance of Counsel

Although the petitioner testified at the post-conviction hearing as to a number of ways in which he believed that trial counsel were ineffective, the claims on appeal have been reduced to three: (a) trial counsel were ineffective for failing to interview prosecution witnesses, (b) failing to find and call "witnesses vital" to the defense, and (c) failing to pursue the motion to suppress his confession.

### A. Failure to Interview State's Witnesses

The petitioner argued, as the substance for this claim, that trial counsel was incompetent for not determining the identity of and interviewing the informant who had assisted the investigators:

> I feel like my attorney should have investigated that was there [sic] an informant or did the State just rely on that testimony to prove – to suggest that the arrest was valid because there was nothing presented at trial, you know, in regards to an informant – that there was an informant. The only thing Officer Morris testified to that an informant had seen me in the presence of a VCR and videotape – not in possession – in the presence of it.

Other than this statement, the petitioner did not elaborate at the hearing about his belief that trial counsel should have interviewed the State's witnesses. However, his trial counsel spoke of this matter:

> Q. Did you discuss with him the state witnesses that you talked to and what they had told you?

A. I'm not sure I personally talked to any state witness. That's why I got the Court to allow me to hire a Private Investigator. I did get reports. Ms. Askew made it her practice to interview not only all names in the file but any other leads that she got. I knew what the witnesses were gonna [sic] say. I had their statements.

In its written findings as to the petitioner's complaints that his trial counsel had not interviewed the State's witnesses, the post-conviction court found:

> [Trial counsel] stated that the State's case was very good against the petitioner. Although there were no eye witnesses to the actual killing of Robert Smith, the State could prove that the petitioner took the victim's payroll check to a service station and cashed the check. The petitioner was identified by the clerk. The petitioner's girlfriend had called the police and given the police a VCR and other evidence which connected the petitioner with the offense. Coupled with all this evidence and the petitioner's statement, the chances for a conviction were good. [Trial counsel] described the petitioner as very remorseful over the killing of the victim. [Trial counsel] agreed that he did not talk to every State witness, but he did have his investigator, Tammy Askew, interview each one. This information was shared with the petitioner.

Although the petitioner hypothesizes, as we understand his claim, that his trial counsel should have investigated whether there really was an informant, the nonexistence of which might have, by his theory, invalidated his arrest, we decline to engage in such speculation. We note that the petitioner was interviewed during the initial investigation of the crime, apparently before the informant had told of seeing the petitioner with the victim's VCR and movies. The owner of a jewelry store in Milan identified a ladies' diamond ring which he had sold to the victim and, after the killing, sized for the petitioner. Apparently, this ring was recovered from the petitioner's girlfriend, who told police that the petitioner had given it to her. As further proof against the petitioner, a service station employee testified that the petitioner had cashed the victim's paycheck. Thus, even absent the informant's tip, which led to the recovery of the victim's VCR and movies from the petitioner's residence, the proof against him was substantial and damning. We conclude, as did the post-conviction court, that the petitioner has failed to establish that trial counsel were ineffective as to interviewing prosecution witnesses.

### B. Failure to Call Witnesses Vital to the Defense

As best we can understand petitioner's testimony, he told at the hearing of information he had as to another person's confessing to the crime, of which he was convicted:

-14-

Well, I had got locked up and I had heard from different people that this girl named Nickie Wright was telling people that she was the one who killed Robert Smith.

THE COURT:  Who was it?

A.    Nickie Wright.

THE COURT:  Nickie?

A.    Yes.  Said that she was the one who had killed Robert, and [ ] – my first attorney, [ ], he asked me why would she confess to a crime.  I told him, "I have no idea.  I don't know what her involvement in this crime was."  When [my second attorney] was appointed to represent me he asked me the same thing – "why did Nickie confess?  What did she had [sic] to do with the crime?"  I told him, "I don't know.  With God as my witness, I have no idea."  But, it was told to me that the night that the man died – the man was killed that she had came home with blood all over her clothes, and on the night that – I feel that the State had evidence of a suspect that was never submitted in evidence because it was told to me that – one of the things that Officer Morris told me that one of the knives had a different blood type than the victim's blood, and they also told me that there was a set of footprints in the house – in the apartment that Robert lived in that didn't belong to me or didn't belong to the victim, so, I feel that that evidence should have been submitted to the jury.

Q.    Did you relate to your attorneys what you knew about this other suspect?

A.    About this other suspect?  I feel that I – I shouldn't have had to.  That was a part of the investigation, you know.  If they had investigated this case adequately they would have found out.

THE COURT:  Maybe I'm missing something.  Did you say there was another suspect whose name you knew but –

A.    No, no, no, no.  No.  What I'm saying is this girl was telling people that she was the one who had killed Robert – that part, but I feel that there was evidence of a second suspect.

THE COURT:  A second person involved?

-15-

A.    Yes, that should have been presented to the jury.

THE COURT:  Well, who is this person?

A.    I have no idea.

THE COURT:  Well, then how would they know?

A.    I don't know.

THE COURT:  Well, I'm like you.  I don't know.  Okay.  But you say they should have known?

A.    Well, I mean – well, the officers at the crime scene investigated. They go to crime scenes; they take footprint samples.  Well, basically what I'm trying to say is I believe that the state purposely withheld evidence that would possibly help exonerate me.

At the hearing, trial counsel was asked about Nickie Wright:

Q.    Do you remember anything about Nickie Wright?

A.    No, sir.  I'll be honest with you.  The name sounds familiar whenever [the petitioner] mentioned it, but I can't tell you the context that it was in this case.

Q.    And did ya'll [sic] not discuss the fact that there was someone else who may have confessed to committing this crime?

A.    I don't recall that.  If he said we did, we may have, but –

Q.    But you don't recall investigating it or having an investigator investigate that?

A.    No, sir.  I don't.

Q.    You said you had reviewed your file notes before coming here today.  If you had had your investigator investigate that would it have been in your notes?

A.    I don't recall seeing the name of Nickie Wright in my file.

-16-

Q. Do you recall seeing anything in your file about the possibility of there being someone else who had committed this crime?

A. No.

As to this claim, the post-conviction court found as follows:

> In sub-ground 7, the petitioner complained that his counsel failed to call witnesses known to him, who admitted to committing the crime charged. In particular, the petitioner stated that he had been told that Nicky Wright had admitted to killing Robert Smith. Both [trial counsel] asked him as to why this person would say this, and the petitioner stated that he had no idea. He was told that this person, Nicky Wright, "had blood on her clothes, but it was a different type from the victim's." Also, the petitioner stated that he had been told some unknown person had killed Robert Smith and that his attorney should have found this person and called him or her to testify. However, even the petitioner admitted that he did not know the name of this individual and how he learned about this information. However, his attorney should have found out this information.

> In contrast, [trial counsel] stated that the name of "Nicky Wright" was familiar, but he did not have any specific recollection of discussing this person with the petitioner. A review of this investigative and trial file did not reveal such person. In the petitioner's confession of November 30, 1993, he mentioned an alibi involving Nikki Wright. However, this evidentiary record is totally silent as to whether a person "Nicky Wright" exists or what if any role she or he played in the investigation of the death of Robert Smith. Nikki Wright or Nicky Wright was not subpoenaed to testify in this hearing. A review of the trial transcript reflects that Richard Clark testified that the petitioner and Nikki Wright showed up at his apartment on November 27, at approximately 1:30 or 2:00 p.m.

> . . . .

> As to the petitioner's allegation that [trial counsel] failed to call or contact Nikki Wright, the petitioner failed to have this person present at this hearing to verify what, if anything, Nikki Wright knew of the death of Robert Smith. The burden is on the petitioner to establish this allegation and he has failed to do so. There is no merit to this allegation.

-17-

The record on appeal fully supports these findings.

## C.  Failure to Proceed on Motion to Suppress Confession

The petitioner argued that trial counsel were ineffective for not pursuing a motion to suppress his statement:

> [Trial counsel] brought me to Court on April 11th to have a Motion to Suppress my statement. When we got to Court he mentioned to the Judge that he had some questions regarding my statement. Judge Jerman got mad at him and called him a cry baby and told him he comes up here every week with this and that – crying about this, crying about that and questioning his competency and he started to ask the Judge a question and the Judge told him he didn't want to hear nothing else come out of his mouth unless whether he was competent or incompetent to represent me and, so, [trial counsel] requested a recess and, so, after a five minute recess two T.B.I. Agents that were there regarding the suppression, they all was [sic] waiting to get a phone call to where they would have to leave and which one of the guys there was a T.B.I. Agent and one of the guys there was not a T.B.I. Agent. He was protraying [sic] himself as a T.B.I. Agent, which he was Robert Smith's brother and, so, after a recess was had [trial counsel], he turned around and told the Judge that he was not competent, so Judge Jerman told him he needed to get out of my courtroom and I don't want to see you no more today, so, [trial counsel] grabbed his stuff and left out of the courtroom and [second trial counsel], he made no attempts to suppress the statement. He told me that the statement would help me more than it would hurt me and he said because it was more like a second degree murder statement to him than it was a first degree murder statement and I told him that I didn't want the statement used and, so, he just disregarded, you know, my needs and went ahead and had the statement used and admitted into evidence without having a suppression hearing on it.

The petitioner was asked about his conversations with trial counsel regarding trial defenses and the potential value versus detriment of his statement to police:

> Q.   I understand that you weren't pleased or are not now with his selection of defenses, but he did meet with you and discuss at least one defense or possible defense about intoxication?
>
> A.   Well, I'll tell you like I said before. He told me that the statement would help me more than it would hurt me and in my

-18-

statement I alleged that I was intoxicated, so, I felt that that was his defense – intoxication.

Q.    Let's talk about your statement since you've brought that up. Numerous times in your Petition in one way or another you've complained that the statement you gave was not attacked or that there wasn't a greater push to have it suppressed.  Can we agree on that?

A.    Yes.

Q.    Okay.  Have you just testified that you and [trial counsel] discussed using the statement or trying to get it suppressed?

A.    That's what I just told you.

Q.    Okay.  And [trial counsel] as your attorney indicated to you that he thought allowing the statement in from a strategic standpoint might actually help you and I'm not asking you if you agree with that conclusion, but is that what he told you?

A.    That's what he told me.

The petitioner was asked about prior complaints which he had made as to the competency of trial counsel:

Q.    Altogether . . . how many – including General Sessions, how many times did you appear in front of the General Sessions Court and the Circuit Court in this cause in Gibson County?  I'm not gonna [sic] hem you down to a number.  Just give me your best estimate.  You may remember.  I don't know.

A.    I'd say approximately maybe four or five times.

Q.    How many of those times did you inform a Judge that you were unsatisfied with the services of your counsel?

A.    I never informed a Judge that I was not satisfied.

Q.    That you were not satisfied with them?

A.    Uh huh.

Q.    In other words, –

-19-

A.     At the time – I know more now about the law than I knew before I went to trial and at the time I was charged, so, everything that [both trial counsel] was [sic] doing, I felt it was what they was [sic] supposed to be doing until I studied up on the law and found out that this was not proper.  You know, some of the things they did they could have done better.

Having been asked about the petitioner's smoking crack cocaine the night of the killing, trial counsel explained his understanding of and actions as to the confession:

Q.     Was that issue presented at the guilt phase of the trial?  I suppose it wouldn't have been appropriate at the guilt phase.  Explain to the Court why that was not raised in the suppression motion.  I know you've covered this, but –

A.     Because [the petitioner] never told me any of the facts he's testified to today to indicate that his confession was not voluntary.  In fact, he told me it was.  Had I known that he was saying that Investigator Morris or Investigator Hughes or any other law enforcement officer had made threats to him, I would have looked into that.

Q.     So, he never made that allegation to you?

A.     No.

Q.     At any point to your recollection during trial preparation did he make a definitive statement that he was under the influence of a controlled substance when his statement was taken?

A.     I can't answer that.

Q.     Okay.  Did he ever give you any indication that the statement was given anything but voluntarily?

A.     No, and I will state this.  I believe that he had been in custody for some period of time before he gave the statement.  I don't know how long.

Q.     What importance would you attach to that?

A.     Well, I'm not a clinical person, obviously, but it would seem to me that perhaps if a person is taken away from alcohol or drugs that

-20-

they become out from under the influence and I want to stress that the decision about his statement was discussed with [the petitioner] and the letter that I sent to [the district attorney general] wherein I outlined a proposal that [the petitioner] be allowed to plead guilty to second degree murder and stating my reasons which ties in with everything that I said and did in this case and was with [the petitioner's] consent.

As to this issue, the post-conviction court found as follows:

> In sub-ground 8, the petitioner complained that his attorneys did not seek suppression of his confession. However, in his testimony, the petitioner acknowledged that both attorneys, [ ], filed motions to suppress his confession. During cross-examination, the petitioner conceded that he really did not have any complaints about the representation of [first trial counsel]. [First trial counsel] had filed a motion to suppress his confession, but according to the petitioner, [first trial counsel] and the trial judge got into it, whereby the "trial judge dogged him out." As to the motion filed by [second trial counsel], the record established that at the hearing of the motion to suppress, [second trial counsel] and the petitioner had a conversation over the merits of the admissibility of the confession. It was [second trial counsel's] understanding that the petitioner agreed to have the motion withdrawn since the statement set forth the defense of drug abuse and intoxication as a defense. According to [second trial counsel's] testimony, he was under the impression from conversations with the petitioner, that his confession was voluntary and that he was unaware until this hearing of the threats or intimidation by law enforcement officers. The Court finds the testimony of [second trial counsel] more credible on this point that the petitioner did voluntarily withdraw his motion to suppress.
>
> . . . .
>
> As to the petitioner's claim that [second trial counsel] failed to follow through on the motion to suppress his confession, the Court finds [second trial counsel's] testimony more credible on this issue. [Second trial counsel's] professional opinion was that this confession could be utilized to support the defense of intoxication and diminished capacity. Also, [second trial counsel] had not been informed that this confession was alleged to have been obtained through coercion or threats but he believed that the confession was voluntary on the petitioner's part. After discussion with the petitioner

-21-

and his consent at the suppression hearing, [second trial counsel] elected to withdraw the motion. This decision was strategical and tactical on the part of [second trial counsel], and thus, this Court cannot find fault with this decision.

The post-conviction court resolved the conflicting testimony in this regard by crediting that of trial counsel. The record supports that finding and the reasonableness of counsel's decision because the statement did present the defenses of drug abuse and intoxication.

The post-conviction court found that the petitioner had failed to establish that his trial counsel were ineffective:

> From this Court's analysis of the evidence in this record, the Court finds that the petitioner has failed to establish that the representation of [trial counsel] is deficient. Therefore, it is unnecessary to address any aspect of prejudice.
>
> From the onset of representation by [trial counsel], he fully discussed all aspects of the charges with the petitioner. This is evident by the motions filed by this attorney, and his letter, with the consent of the petitioner, to the District Attorney General. [Trial counsel], through *ex parte* proceedings, was able to obtain experts for psychological purposes and investigative services from the trial court. The petitioner was fully advised of this service as he stated in his testimony. From [trial counsel's] investigation and viewpoint, the State had a strong case against the petitioner. It was [trial counsel's] professional judgment, based upon the facts, that two defenses were applicable for a jury's consideration. First, intoxication, although weak, was based upon the defendant's alcoholic history and drug abuse. Second, the petitioner was on a two-day binge from crack cocaine which could affect his mental culpability, and thus, reduce the offenses of murder first to murder second degree. In support of these two defenses, [trial counsel] filed a defense of diminished capacity and had Dr. Lynn Zagler, psychologist, testify in support of the defenses of intoxication from drug abuse and diminished capacity. Likewise, [trial counsel] had Richard Clark testify as to his and the petitioner's use of cocaine on the night of Robert Smith's death. These decisions were well within [trial counsel's] professional judgment and this Court agrees.
>
> . . . .

Clearly, the petitioner has failed to establish that [trial counsel] was deficient in his representation of the petitioner and has failed to establish that [trial counsel's] advice and services did not meet the range of competence demanded by attorneys in criminal cases. Therefore, the petition must be denied.

The record on appeal fully supports the conclusion of the post-conviction court that the petitioner failed to establish that trial counsel were ineffective. Accordingly, we conclude that the post-conviction court did not err in denying the petition for post-conviction relief.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE